UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOHN DOE,

                              Plaintiff,

         -v-                                    1:20-CV-1185

RENSSELAER POLYTECHNIC INSTITUTE,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

E. STEWART JONES HACKER MURPHY, LLP        JULIE A. NOCIOLO, ESQ.
Attorneys for Plaintiff                    JAMES C. KNOX, ESQ.
28 Second Street
Troy, New York 12180

PATTISON, SAMPSON LAW FIRM                 MICHAEL E. GINSBURG, ESQ.
Attorneys for Defendant
P.O. Box 208
22 First Street
Troy, New York 12181

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

**I.**   **INTRODUCTION**

On Monday, September 28, 2020, the Court granted a motion for a temporary

restraining order ("TRO") by plaintiff John Doe ("Doe" or "plaintiff") under Federal Rule of Civil

Procedure ("Rule") 65.  Essentially, plaintiff asked the Court to halt an imminent disciplinary

hearing brought against him by defendant Rensselaer Polytechnic Institute ("RPI" or

"defendant") to address a fellow student's accusation that he sexually assaulted her.  Plaintiff

alleges that defendant is discriminating against him on the basis of sex in contravention of

Title IX of the Education Amendments of 1972 ("Title IX") through procedural irregularities in its disciplinary process and its disposal of his own Title IX sexual assault complaint.  At 10:00 a.m. on Thursday, October 8, 2020, the parties presented oral argument on the question of whether that TRO should be converted into a preliminary injunction.  That issue, having been fully briefed, will now be decided on the basis of the parties' submissions and oral argument.

## II.   <u>BACKGROUND</u>

At all relevant points for this case, Doe has been a student at RPI.  Plaintiff alleges he chose defendant because it has a high-ranking engineering pedigree and the various technological assets that ranking brings with it.  However, plaintiff did not choose to live on defendant's campus, instead opting to live nearby in Troy, New York.

In November of 2019, Doe, a senior, and female RPI freshman Jane Roe ("Roe") met through the online dating application Tinder.  Dkt. 10-6 ("Roe Int. 1"), pp. 5, 9.[1]  Plaintiff and Roe spoke through varied electronic media periodically throughout the end of the Fall 2019 semester and over the winter break in advance of the Spring 2020 semester.  Dkt. 10-15, p. 3.  Upon returning to Troy in advance of the Spring 2020 semester, plaintiff and Roe met in person and had consensual sex on multiple occasions in January of this year.  *Id.* at 3, 9.

One morning after Roe had slept over at Doe's apartment, Roe alleges that she discovered that plaintiff had been using his cell phone to record video of her as she was dressing.  Roe Int. 1, p. 6.  Roe claims she was immediately disturbed by plaintiff's surreptitious filming, and asked a friend to pick her up from plaintiff's apartment.  *Id.*  That friend then apparently confronted plaintiff about the video, and plaintiff reassured him that the video had been deleted from the phone.  *Id.*

---

[1] Pagination corresponds with CM/ECF.

Either late in the night of January 22 or early in the morning of January 23, 2020, Roe invited Doe to her dorm room again.  Roe claims that she agreed to discuss with plaintiff her anger at his having filmed her, which was a conversation that she did not feel comfortable having at his off-campus apartment.  Roe Int. 1, p. 6.  Plaintiff alleges that he was too drunk to drive, so he walked to her residence hall and joined Roe in her room.  Dkt. 10-15, p. 9.  Once there, both plaintiff and Roe agree that plaintiff had multiple drinks of vodka.  Dkt. 1-11 ("Plf. Appeal"), p. 2; Dkt. 10-14 ("Roe Int. 2"), pp. 7-8.  Plaintiff then alleges, and based on her own eventual Title IX complaint against him Roe does not disagree, that the two of them had consensual sex.  Dkt. 1-10, p. 2 ("Roe Cmpt.").

Roe and Doe's narratives of their encounter that night and morning diverge at approximately 3:00 a.m.  To hear plaintiff tell it, Roe remained sober the entire night while she plied him with excessive amounts of alcohol.  Dkt. 10-15, p. 9.  He alleges that Roe eventually began to pressure him to have sex with her again, but he refused because he had only brought one condom and did not want to have unprotected sex.  *Id.*

However, Doe eventually gave in and had sex with Roe again.  Dkt. 10-15, pp. 9-10. Plaintiff claims that he remembers only pieces of this round of intercourse, but he claims to distinctly remember that Roe asked him to put his hands around her neck, even though this made him uncomfortable.  *Id.* at 10.  Plaintiff eventually complied, if only briefly.  *Id.*  Roe agrees that she requested that plaintiff put his hand on her neck and provide pressure, but she claims that this happened during their first, consensual encounter on that night. Dkt. 10-14 ("Roe Int. 2"), p. 10.

Doe further alleges that Roe then began to pressure him into having anal intercourse with her.  Dkt. 10-15, p. 10.  He also claims that eventually, despite his recurring protest that he did not wish to engage in intercourse without a condom, he had anal sex with Roe for

3

"about ten seconds" before stopping because he felt uncomfortable.  *Id.*  Plaintiff claims that after he and Roe concluded their second intercourse, he needed to ask her to get him water because he was too drunk to get out of bed.  *Id.*

Roe agrees that Doe had trouble getting out of her bed at one point during the night of January 22.  Roe Int. 2, p. 7.  She also noted during an interview with a Title IX investigator that plaintiff had been "getting kind of weird" and that he informed her he was under the influence of "a couple substances," which caused him to act "different from usual."  Roe Int. 1, p. 6.

The next morning, plaintiff left Roe's room because she needed to go to class. Dkt. 10-15, p. 10.  Plaintiff alleges that the psychological damage from being pressured into sex with which he was not comfortable forced him to take a medical leave from school.  *Id.*

By contrast, Roe alleges in her Title IX complaint that after the initial consensual encounter, she and Doe began to argue.  Roe Cmpt. p. 2.  In the midst of this argument, she asserts that plaintiff again put his hand around her neck and squeezed—this time both in a non-sexual context and without her consent—which caused Roe to be afraid for her safety. *Id.*  She further alleges that between 3:00 a.m. and 5:00 a.m., plaintiff rubbed his penis against her back, buttocks, and legs without her consent.  *Id.*  At her eventual interview with the Title IX investigator assigned to her case, Roe also said that she may have unwillingly engaged in sexual intercourse with plaintiff because she was afraid he would hurt her if she denied him and in the hope that if she complied he would just go to sleep and the encounter would be over.  Roe Int. 1, p. 14.

But according to Roe, her compliance was not the end of it.  At about 9:00 a.m. on January 23, 2020, Roe alleges that Doe again engaged in sexual activity with her without consent.  Roe Cmpt. p. 2.  Eventually, Roe complained to plaintiff that the sex was painful, at

which point plaintiff apparently continued intercourse while asking her if she would like him to stop.  Roe Int. 1, p. 7.  Roe responded that she would, and plaintiff continued for a "couple more seconds longer" before stopping.  *Id.*

On January 27, 2020, Roe's resident advisor informed RPI that a sexual assault had allegedly taken place on January 23, 2020.  Dkt. 11-1 ("Hardy Aff."), ¶ 6.  On January 31, 2020, defendant notified Doe that it was initiating a Title IX investigation against him as a result of that incident.  Dkt. 1-1, p. 2.  On June 9, 2020, plaintiff filed his own Title IX complaint against Roe, alleging that he was too intoxicated to consent to sexual activity on the night of January 23.  Dkt. 10-15, p. 9.  Roe was interviewed by a Title IX investigator concerning her own complaint on February 3, 2020, Roe Int. 1, p. 1, and interviewed  again concerning plaintiff's complaint on July 17, 2020, Roe Int. 2, p. 1.

On August 4, 2020, RPI concluded by a preponderance of the evidence that it was more likely than not that Doe violated the school's August 24, 2018 Student Sexual Misconduct Policy ("the 2018 policy") by sexually assaulting Roe.  Dkt. 1-10, p. 2.  As was his right, plaintiff requested a hearing to challenge the initial finding that plaintiff had violated defendant's sexual misconduct policy.  Hardy Aff., ¶ 42.  That same day, defendant dismissed plaintiff's Title IX complaint against Roe, finding that he had failed to establish his allegations by the same standard.  Dkt. 1-9, p. 2.

In particular, RPI found that Doe's participation in complex conversation, recall of details, ability to leave and re-enter Roe's residence hall at 2:30 a.m. to smoke, and his failure to prove that he did not willingly consume alcohol or initiate sexual activity with Roe made his complaint insufficiently credible.  *Id.*  In fact, plaintiff was recorded on a campus security camera leaving the residence hall at 2:30 a.m., and according to defendant his gait

appeared steady on the captured footage, although plaintiff paused while climbing the stairs for an unknown reason.  Dkt. 10-15, p. 12.

Doe timely appealed RPI's determination on August 11, 2020, requesting a hearing as to his claim's dismissal.  Pl. Appeal p. 2.  In particular, he argued that defendant: (1) overlooked facts in Roe's July 17, 2020 interview establishing that he had consumed alcohol and smoked marijuana before arriving at Roe's dorm, drank vodka "many times" while in her room, and "had trouble getting off" Roe's bed; (2) erroneously relied on the irrelevant determination that there was insufficient evidence that plaintiff was supplied alcohol against his will; and (3) erroneously relied on the irrelevant determination that plaintiff failed to prove he did not initiate sexual activity.  *Id.* at 2-3.  Defendant denied plaintiff's appeal on August 25, 2020, claiming that plaintiff had failed to demonstrate an error in the denial that would merit a hearing.  Dkt. 1-12, pp. 2-4.

Meanwhile, far from the practical realities of Doe's dispute with RPI and Roe's allegations against him, the United States Department of Education advanced new regulations governing Title IX sexual assault and harassment proceedings (the "new Title IX rules" or "new rules") at covered institutions, which took effect on August 14, 2020.  Dkt. 1-5, p. 2.

Practically speaking, the new rules would guarantee Doe eight rights, among others: (1) notice of the allegation, including sufficient details of the complaint and time to prepare a response; (2) the college being required to carry the burdens of proof and production against plaintiff; (3) a requirement that the evidence be evaluated objectively and not weighted differently for the complainant, respondent, or witnesses; (4) a presumption of his innocence; (5) notice of the applicable standard of proof; (6) plaintiff's ability to inspect and review evidence obtained as part of the investigation into the allegations; (7) the ability for plaintiff's

advisor, be it an attorney or a school-provided counselor, to cross-examine witnesses; and (8) a limited right to appeal the school's ultimate determination.  *See* U.S. Dep't of Educ., Secretary DeVos Takes Historic Action to Strengthen Title IX Protections for All Students (2020), https://www.ed.gov/news/press-releases/secretary-devos-takes-historic-action-strengthen-title-ix-protections-all-students (last visited Oct. 13, 2020).

However, according both to the preamble of the new rules and to a blog post published by the Department of Education's Office of Civil Rights (the "OCR post"), the Department of Education "will not enforce [the new Title IX rules] retroactively."  Dkt. 1-8 ("OCR Post") pp. 2-3.  Instead, the OCR post states that a school will only be found to be noncompliant with Title IX if schools do not use the new rules to investigate and adjudicate instances of sexual harassment events "that allegedly occur[ed] on or after August 14, 2020." *Id.* at 3.

In acknowledgement of the new Title IX rules, RPI updated its Student Sexual Misconduct Policy on August 14, 2020 ("the 2020 policy").  Dkt. 1-4.  Doe and his counsel, naturally interested in the new rules' additional protections for students accused of sexual assault, spoke to defendant's Title IX coordinator to request that the remainder of his investigation and his impending disciplinary hearing be conducted under the 2020 policy. Hardy Aff., ¶ 44.  Citing the OCR post, defendant's Title IX coordinator responded that his hearing would follow the 2018 policy because the new rules were not retroactive.  *See id.* ¶ 45.

On September 28, 2020, Doe filed a complaint alleging that RPI's handling of his cross-complaint against Roe and its refusal to employ the 2020 policy amounted to sex discrimination in violation of Title IX.  Dkt. 1.  With that complaint, plaintiff also moved for a TRO and a preliminary injunction to prevent defendant from moving forward with its hearing

against him, at least under the 2018 policy.  Dkt. 3.  That same day, the Court granted

plaintiff's TRO.  Dkt. 6.  On October 8, 2020, the Court heard oral argument as to whether the

TRO should be converted into a preliminary injunction.  Text Minute Entry Dated Oct. 8,

2020.  All that is left is to decide that issue.

## III.   LEGAL STANDARD

The Second Circuit requires a plaintiff seeking a preliminary injunction to prove four

elements:  "(1) a likelihood of irreparable harm; (2) either a likelihood of success on the merits

or sufficiently serious questions as to the merits plus a balance of hardships that tips

decidedly in [the movant's] favor; (3) that the balance of hardships tips in [the movant's] favor

regardless of the likelihood of success; and (4) that an injunction is in the public interest."[2]

*Chobani, LLC v. Dannon Co.*, 157 F. Supp. 3d 190, 199 (N.D.N.Y. 2016) (analyzing changes

to Second Circuit preliminary injunction standard and comparing existing standards).  The

movant must make a "clear showing" that each of these elements is met.  *Winter v. Nat. Res.*

*Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

## IV.   DISCUSSION

The principal dispute among the parties is the likelihood of Doe's success on the

merits of his Title IX claims.  The other requirements for preliminary relief are secondary

concerns that will be discussed if plaintiff succeeds in showing a likelihood of his success on

his claims.

### A.     Likelihood of Success on the Merits.

The precise likelihood of success that a plaintiff must show varies depending on

whether a plaintiff seeks a mandatory injunction, which compels that a defendant act in a

certain way that alters the status quo, or a prohibitive injunction, which only prevents a

---

[2] The Second Circuit appears to still in the process of formally harmonizing its prior existing standards with the
four-element test required by the Supreme Court in *Winter*, 555 U.S. at 20.

defendant from following the course it had originally intended and thus maintaining the state of affairs at the time the injunction is issued.  *Tom Doherty Assocs. v. Saban Ent., Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995).

A mandatory injunction should be granted "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief."  *Id.* at 34.  In other words, a motion for a mandatory injunction requires a showing of "a greater likelihood of success" than for a prohibitive injunction.  *Id.*

But for a prohibitive injunction, a plaintiff must only "show a greater than fifty percent probability of success . . . ."  *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34-35 (2d Cir. 2010).  By extension, prohibitive relief may be warranted even though there remains "considerable room for doubt" about whether the plaintiff will ultimately prevail.  *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)).

Thus, in order to know how likely Doe's success must be, the Court must first consider whether the injunction he requests is mandatory or prohibitive in nature.  That question would do Schrödinger proud,[3] because it cannot be answered until the Court determines the scope of the injunction it would consider granting.  If the Court enjoins RPI such that it must proceed with the hearing under its 2020 policy, that injunction would be mandatory, and plaintiff would need to prove a substantial probability of success on the merits.  Alternatively, if the injunction were to enjoin defendant from conducting the hearing at all, that injunction would

---

[3] Schrödinger's cat is a famous paradox in which a cat is placed in an opaque box and his life or death becomes dependent on a random event.  Robert Sanders, *Watching Schrodinger's Cat Die*, BERKELEY NEWS (July 30, 2014), https://news.berkeley.edu/2014/07/30/watching-schrodingers-cat-die/ (last visited Oct. 14, 2020).  The gist of the thought experiment is that the cat's fate cannot be known until after the box is opened, meaning that while the box remains closed, the cat must be thought of as simultaneously alive and dead.  *Id.*

be prohibitive and plaintiff would only need to prove a probability of success greater than fifty percent.

The parties disagree what, exactly, Doe is seeking to enjoin.  Plaintiff claimed at oral argument that he intended to compel RPI to carry out the hearing under the 2020 policy.  For its part, defendant counters that an injunction, if granted, should halt proceedings in their entirety.  But regardless of the parties' formulations, the scope of the injunction is ultimately the Court's own decision to make.  *See Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 174 (2d Cir. 2001) (noting that district court "is vested with full discretion to determine whether to grant an injunction and its scope" (cleaned up) (citing *All. Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 143 F.3d 688, 692-93 (2d Cir. 1998), *reversed on other grounds sub nom. Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999)).

Thus, after some consideration, the Court will consider whether to impose the prohibitive injunction of freezing the hearing and any potential discipline altogether.  Forcing RPI to conduct a hearing under the 2020 policy without a final judgment that its policies and conduct violated Doe's rights seems too harsh an outcome when simply halting plaintiff's hearing would protect his rights just as well with a cleaner stroke.  The imminent harm plaintiff complains of—having his fate decided by an institution he claims is discriminating against him—would be if anything better prevented by freezing all proceedings against him than by allowing the alleged discriminator to go forward with its hearing, even with a few more procedural safeguards.  Accordingly, the Court need only consider whether to enjoin defendant from proceeding with plaintiff's disciplinary hearing and thus plaintiff need only prove the greater than fifty percent likelihood of success required by prohibitive injunctions.[4] *Citigroup*, 598 F.3d at 34-35.

---

[4] Framing the injunction in this way also puts it a substantial distance from being one that affords plaintiff "substantially all the relief sought" such that he must alternatively make an enhanced showing of entitlement to

**1. <u>Sex Discrimination.</u>**

To evaluate Doe's likelihood of success on his claims, the nature of the claims he is trying to prove must also be clarified.  There are two.  First, plaintiff alleges that RPI discriminated him on the basis of sex in violation of Title IX for electing to hold his hearing under the 2018 policy instead of the 2020 policy.  Second, plaintiff claims that defendant violated Title IX by selectively enforcing its misconduct policies to his detriment by dismissing his complaint against Roe but allowing her claim based on the same encounter to proceed.

Both of Doe's claims grow from Title IX's fundamental tenet that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"  20 U.S.C. § 1681(a).  As a result, Title IX bars "the imposition of university discipline where gender is a motivating factor in the decision to discipline."  *Doe v. Colum. Univ.*, 831 F.3d 46, 53 (2d Cir. 2016).

For a Title IX sex discrimination claim, the Second Circuit has ruled that a university runs afoul of the statute when it:  "(1) takes an adverse action against a student or employee[;] (2) in response to allegations of sexual misconduct[;] (3) following a clearly irregular investigative or adjudicative process[; and] (4) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex[.]"  *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019) (clarifying elements of tort first recognized in *Columbia*, 831 F.3d 46).

---

the injunction.  *Tom Doherty*, 60 F.3d at 33-34.  Although plaintiff would still be entitled to damages to redress his selective enforcement claim and his sex discrimination claim, centrally at issue in this case is whether the 2020 rules should apply to plaintiff's hearing.  Mandating that the 2020 rules apply would give plaintiff a substantial portion of his requested relief, though not all of it.  It would be better to avoid reaching that question in the absence of briefing, and thus the Court is strongly incentivized to limit the scope of the potential injunction as discussed above.

Additionally, both *Columbia* and *Menaker* suggest that this type of claim is to be analogized to the better-explored Title VII claim. *See Menaker*, 935 F.3d at 31 (noting that Title VII caselaw informs Title IX claims and that Title IX bars university discipline where gender is a motivating factor); *Columbia*, 831 F.3d at 53-54 (same). Accordingly, in addition to proving those four prima facie elements, a plaintiff must also prove that gender was a motivating factor in the adverse action. *Id.*

Doe's sex discrimination claim relies on the 2020 policy as evidence of both an adverse action and of a "clearly irregular investigative or adjudicative process[.]" *Menaker*, 935 F.3d at 33. As a result, the retroactivity of the new Title IX rules, and thus the question of whether defendant must use the 2020 policy to adjudicate plaintiff's hearing, is largely irrelevant to the claim. Instead, all that matters is that rather than conduct the hearing under the 2020 policy—which defendant has already designed and will implement for new Title IX complaints going forward—defendant insisted that the hearing in plaintiff's case would proceed under the 2018 policy.

In other words, whether the Department of Education would have penalized RPI for not complying with the new rules or not, it could easily have implemented the 2020 policy for Doe's hearing because it must implement that policy for all future Title IX complaints. Instead, defendant decided that it would be best to maintain two parallel procedures solely to ensure that at least some respondents would not have access to new rules designed to provide due process protections such as the right to cross-examination that have long been considered essential in other contexts. *See, e.g.*, *Pointer v. Texas*, 380 U.S. 400, 405 (1965) (noting that "to deprive an accused [in criminal settings] of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law").

Such disregard for the inevitable administrative headaches of a multi-procedure approach certainly qualifies as evidence of an irregular adjudicative process.  Similarly, the Court finds that a school's conscious and voluntary choice to afford a plaintiff, over his objection, a lesser standard of due process protections when that school has in place a process which affords greater protections, qualifies as an adverse action.  That is precisely what RPI did in this case.

Doe has thus provided ample evidence to demonstrate both the elements of an adverse action and an irregular adjudicative process of his prima facie case for RPI's decision to follow the 2018 policy instead of its 2020 policy.  Moreover, neither party can seriously dispute that plaintiff has been subjected to allegations of sexual misconduct.  Plaintiff has thus at the very least established a reasonable probability of success on each of the first three elements of a prima facie case of discrimination under *Columbia*.

As to the fourth element, although there is little evidence in the record to date that RPI has been criticized for reacting inadequately to allegations of sexual misconduct by members of one sex, the Second Circuit has noted that "when combined with clear procedural irregularities in a university's response to allegations of sexual misconduct, even *minimal* evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination."  *Menaker*, 935 F.3d at 33 (emphasis in original).  Accordingly, and especially given both the frequency and the publicity of universities being taken to task on this particular and serious subject, the paucity of evidence as to the fourth element at this moment does not meaningfully undermine Doe's probability of success at trial.

Of course, Doe must still show that gender was a motivating factor in RPI's decision to employ the 2018 policy instead of the 2020 policy.  To defendant's point at oral argument, its decision to apply the 2018 policy for all sexual misconduct complaints filed prior to August 14,

2020 applies equally to both sexes and does not by itself provide evidence that gender played any role, let alone a motivating one, in its action.

But Doe's evidence of sex discrimination is not so confined as to only include RPI's conscious choice not to employ the 2020 rules to his disciplinary hearing.  Rather, there are two aces up plaintiff's sleeve for that game, each tied to defendant's handling of plaintiff's complaint against Roe.  First, RPI specifically noted that Doe's complaint against Roe was insufficiently substantiated because he failed to prove that he did not voluntarily consume alcohol and did not initiate sexual contact with Roe.

This raises a powerful inference of sex discrimination.  After all, RPI's  reliance on these twin findings is curious considering that even the 2018 policy makes no mention of voluntary consumption of alcohol as a factor bearing on the question of a complainant's inability to consent due to excess intoxication.  Dkt. 1-2, p. 11 (defining consent under 2018 policy).  Instead, that rule states that "[d]epending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to consent."  *Id.*  Any carveout based on voluntary intoxication must be cleverly hidden indeed to hide among such plain language.  *Id.*

Similarly, the 2018 policy does not provide any exceptions to the rule that "[c]onsent may be initially given but withdrawn at any time."  Dkt. 1-2, p. 11.  As a consequence, RPI's specific finding that Doe failed to prove that he did not initiate his sexual encounter with Roe is once again bizarre, since it is apparently directly contrary to defendant's own sexual misconduct policies.  *Id.*

In a vacuum, RPI's inventive use of its policies may not say much about the role Doe's gender played in the process, but Roe's complaint arising out of the same encounter was not subjected to any of these fabricated requirements.  The two complaints concerned the same

14

subject matter, of which only the two complainants had first-hand knowledge. From that duality of origin, the female's complaint proceeded without issue, the male's was struck down in part on grounds not contemplated anywhere in the policy's definition of consent. That inequitable treatment provides not inconsiderable evidence that gender was a motivating factor in RPI's treatment of Doe.

Second, even removing those two questionable bases from RPI's determination, the remaining evidence for and against both complaints makes defendant's differing results along gender lines seem outcome-oriented. From an evidentiary standpoint, defendant found Doe's complaint to be unsubstantiated based on: (1) his participation in a complex conversation; (2) his recall of details of the incident; and (3) his ability to leave Roe's room to smoke and to walk steadily at approximately 2:30 a.m., as evidenced by footage caught on a security camera. Dkt. 1-9, p. 2.

RPI's first basis appears to credit Roe's narrative of the encounter over Doe's without providing any reasons for doing so. Plaintiff does not describe a complex conversation at any point in his allegation, instead describing simple conversations along the lines of Roe inviting him to drink alcohol and her requests that they engage in various sex acts. Dkt. 10-15, pp. 9-10. Even Roe's first interview only described plaintiff explaining why he did not think she would care if he filmed her and then how he "g[ot] kind of weird and . . . informed [her] that he was . . . under the influence of a couple substances." Roe Int. 1, p. 6. Other than that, the only conversations Roe describes in that interview are plaintiff complaining of depression and his violent rage during their eventual argument. *Id.* at 13. In fact, it was only during Roe's second interview—after Doe had accused her—that she described him as "completely coherent" in the early morning of January 23. Roe Int. 2, p. 7.

RPI's other two remaining grounds for dismissing Doe's complaint fare similarly poorly when compared to the evidence that apparently sufficiently underpinned Roe's claim.  For example, defendant's summary of the evidence describes plaintiff's gait as "steady" in security camera footage, but glosses over plaintiff's pausing on the stairs as he was climbing them because the reason for the pause was "not clear."  Dkt. 10-15, p. 13.

By contrast, every witness interviewed for Roe's complaint told a different story of what happened between January 22 and 23 of 2020, and only one in addition to Roe herself mentioned the initial consensual sex that preceded the sexual assault that Roe alleges.  *See generally id.* at 5-8.  One of Roe's witnesses even stated that plaintiff "was apparently very out of it" and Roe "was allowing him . . . to lay down" until he could recover enough to leave, seemingly supporting plaintiff's narrative.  *Id.* at 6.  And yet, Roe's complaint received the benefit of the doubt while plaintiff's did not.

Of course, the Court does not expect a person to accurately remember or relay every detail of a traumatic narrative like the ones that Roe—and plaintiff—allege.  But where the allegations are so inherently intertwined and the female's complaint is accepted, flaws and all, while the male's complaint is rejected for having similar flaws, that discrepancy lends force to the conclusion that the difference is traceable to gender discrimination.

Of course, RPI might object that it is erroneous to lump together evidence of Doe's selective enforcement claim with his sex discrimination claim.  But it would be wrong.  After all, the two complaints were subject to the same investigation, see Dkt. 10-15 (summarizing evidence of both claimants' allegations), with a determination coming down on the same day, compare Dkt. 1-10 (upholding Roe's complaint against plaintiff on August 4, 2020), with Dkt. 1-9, (dismissing plaintiff's complaint against Roe on the same date).  What is more, both complaints arose from the same encounter, to which only the two claimants of differing sexes

were witness.  Defendant's handling of these two comparators throughout this matter is thus useful to evaluate whether the complainant's sex played a role in  the entirety of the relevant proceedings.

Thus, combining these two dimensions of RPI's decision to dispose of Doe's claim while allowing Roe's to survive, plaintiff has provided sufficient evidence to demonstrate a likelihood of success in proving that gender was a motivating factor in defendant's treatment of him since Roe first leveled her accusation.

RPI counters Doe's showing by arguing that he has no right to have his hearing governed by the 2018 policy because both the preamble to the new Title IX rule and the OCR post state that the Department of Education will not enforce the new rule retroactively.[5]  To hear defendant tell it, the preamble and the OCR post provide it license not to impose the new rules for sexual assault allegations where the alleged assault took place before August 14, 2020.  In fact, defendant argues that those statements preclude this Court from finding to the contrary because it is bound to defer to an agency's interpretations of regulations that it promulgates.  *See Auer v. Robbins*, 519 U.S. 452, 459-62 (1997).

Doe fires back that the preamble does not have the force of law and that the OCR post is not due any deference because it lacks formality and does not turn on the Department of

---

[5] As a careful reader might note, this argument does not meaningfully address any element of a prima facie case of gender discrimination in the style of *Columbia*, nor does it provide much evidence that gender did not motivate defendant's actions.  Instead, defendant's argument amounts to an allegedly non-discriminatory reason for its choice not to follow the 2020 policy in carrying out plaintiff's hearing under the framework announced in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), which governs plaintiff's sex discrimination claims.  *Columbia*, 831 F.3d at 55-56.  Under that framework, a plaintiff must prove out a prima facie case that he was discriminated against, at which point he will benefit from a presumption of a discriminatory motive on the defendant's part.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008).  A defendant may rebut that presumption through evidence of a non-discriminatory reason for the adverse action plaintiff complains of, at which point the plaintiff must show that discrimination actually motivated the defendant's adverse action.  *Id.*  Of course, the *McDonnell-Douglas* framework is not implicated at trial, but plaintiff must nevertheless pass through its scrutiny at summary judgment before he can reach the trial stage, and thus considering defendant's arguments for a non-discriminatory reason for its action is relevant to discussing the likelihood of plaintiff's success.  *See Sharkey v. Lasmo (AUL Ltd.)*, 214 F.3d 371, 374 (2d Cir. 2000) (ruling that it is error to submit *McDonnell-Douglas* instruction to the jury).

Education's substantive expertise. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) (holding that *Auer* deference for agency's interpretations of agency regulations only applies to "an agency's authoritative, expertise-based, fair, or considered judgment" (cleaned up)).

Doe has the better of this argument for three reasons. First, even assuming that the preamble is entitled to deference, it would not be enforcing the new Title IX rules retroactively to use them for hearings occurring after August 14, 2020. After all, the preamble itself is unclear what it means when it discusses retroactivity.

It could mean, as RPI suggests, that the Department of Education would not sanction schools for not applying the new rules to any case where the alleged sexual assault took place before they took effect. But it could just as easily mean that schools would not face Department of Education sanctions if they did not reopen previously completed hearings that did not follow the new Title IX rules. After all, if a hearing—Doe's, for example—occurs under the new rules after August 14, 2020, from a certain point of view that hearing would apply the new rules prospectively because the rules were in effect before the hearing itself took place. In other words, defendant's proposed definition of retroactivity is not the only possible meaning of the word, and its argument does not powerfully sway the Court in defendant's favor.[6]

Second, Doe is correct that the Court is not bound to follow the OCR post because it is not an authoritative statement entitled to *Auer* deference. *Kisor*, 139 S. Ct. at 2414. As such, the OCR post's position that the relevant date for retroactivity is the date the alleged sexual assault occurred need not be the last word on the matter.

---

[6] This logic similarly dispels defendant's argument that administrative rules are not to be read to apply retroactively unless the language of the administrative rule requires the result. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Even if the Court needed to reach the issue of whether a failure to comply with the new Title IX rules would open defendant to sanctions—which it need not—and even if it were inclined to make such a ruling—which it is not—it could do so without holding the new rules retroactive. Instead, it could simply set the relevant time for determining whether the rule is applied retroactively at the time of the proceeding, rather than at the time of the alleged violation.

Moreover, given the logistical problems with that interpretation, the Court is not inclined to rally to that position.  Under the OCR post's standard, schools may maintain two parallel proceedings until every claim of sexual misconduct allegedly occurring prior to August 14, 2020 is resolved.  But it is unclear when that day would come, because there may be several claims that a sexual assault occurred prior to August 14, 2020 that have yet to be brought to a school's attention.[7]  After all, under either the 2018 or 2020 policies, "[a] Complaint of Sexual Misconduct may be filed at any time, regardless of the length of time between the alleged Sexual Misconduct and the filing of the Complaint."  Dkts. 1-2, p. 6; 1-4, p. 6.

It would thus be difficult for a school to provide any kind of timeframe for sunsetting its policies that predate the new Title IX rules when the anchoring principle keeping those policies alive is the hypothetical possibility that new sexual misconduct claims for sexual assaults that took place before August 14, 2020, could arise.  The absurd—yet necessary—result of an institution following the OCR post's guidance to the letter would be that school's indefinite maintenance of an entire alternative procedure, perhaps behind a pane of glass labelled "Break in Case of Emergency," just in case a claim of sexual assault allegedly occurring before August 14, 2020 should arise.

Third and finally, RPI does not even follow the OCR post.  Perhaps to avoid the exact sunsetting issue just described, defendant's 2020 policy makes the following indulgence:  "[a] Complaint of Sexual Misconduct will be investigated and adjudicated using the procedural provisions of the Sexual Misconduct Policy . . . *in effect at the time of the report* and the substantive provisions in effect at the time the conduct allegedly occurred."  Dkt. 1-4, p. 6 (emphasis added).  The OCR post makes no mention of a substantive/procedural distinction

---

[7] At oral argument, defendant claimed it has "many" such cases actually pending, let alone however many more may remain undisclosed.

such that defendant can use the report date to provide a hard deadline to phase out the 2018 policy.  *See* OCR Post, pp. 2-3.  Instead, defendant made that decision for its own convenience, and could just as easily have decided to move forward under the 2020 policy for all cases.

Thus, even if RPI would not be subjected to Title IX consequences from the Department of Education for electing to use the date of the alleged sexual assault as the date that governs which policy it will use, it was still free to choose to use the 2020 policy.  It decided not to, despite the sizeable administrative headaches that decision entails.  Accordingly, Doe will have several viable arguments at his disposal in dealing with defendant's prospective non-discriminatory reason for not proceeding with plaintiff's hearing under the 2020 rules, and defendant's retroactivity argument does not dip plaintiff's showing of likely success on the merits below the requisite fifty-percent threshold.

RPI's final argument against Doe's likelihood of success is that in *Doe v. Rensselaer Polytechnic Institute*, 2019 WL 181280 (N.D.N.Y. Jan. 11, 2019), Senior United States District Judge Frederick J. Scullin, Jr. found that its 2018 policy afforded accused students adequate due process rights and denied a preliminary injunction in similar circumstances.  *Id.* at *7-8.  But that case is fundamentally distinguishable from this one.

First, the new Title IX rules had not even been proposed when Judge Scullin's *Doe* case was decided, let alone had taken effect and been ready for RPI to implement.  Thus, a determination that defendant's policies were sufficient prior to the new rules taking effect means little in the wake of the sea change to the protections afforded to sexual assault respondents at colleges and universities.  *Rensselaer*, 2019 WL 181280, at *7.  Moreover, the plaintiff in the earlier case did not advance a sex discrimination claim with the substantial evidence Doe has marshaled now.  *Id.*  Instead, Judge Scullin only considered an attack on

the procedure defendant employs, not an attack on how that procedure has been disparately applied to men.  *Id.*

All told, RPI's arguments against Doe's evidence do not dissuade the Court from the conclusion that plaintiff has proven that he will likely succeed on his sex discrimination claim under *Columbia*.  He has thus adequately proven his entitlement to a preliminary injunction on the first factor for his first claim.

### 2. <u>Selective Enforcement.</u>

The Court now turns to Doe's second claim that RPI selectively enforced its sexual misconduct policies by dismissing his claim against Roe while he remains saddled with her claim against him.  As the name suggests, a selective enforcement claim "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

Essentially, then, a plaintiff must demonstrate that:  (1) "similarly situated female students . . . were treated differently during investigations and disciplinary proceedings concerning sexual assault"; and (2) the defendant "had the requisite discriminatory intent." *Doe v. New York Univ.*, 438 F. Supp. 3d 172, 181 (S.D.N.Y. 2020).  Much like the *Columbia* sex discrimination standard described above, a defendant had the requisite discriminatory intent if sex was a motivating factor in its decision.  *Yusuf*, 35 F.3d at 715.

As with Doe's *Columbia* sex discrimination claim above, plaintiff has provided adequate evidence that gender has been a motivating factor in RPI's treatment of him throughout its investigation of Roe's sexual assault complaint and its dismissal of his own. Plaintiff has thus provided sufficient evidence of discriminatory intent to show a reasonable likelihood of success on the second element of his selective enforcement claim.

Similarly, it would be difficult to conceive of a more similarly situated female student to Doe than Roe, who was accused of sexual assault stemming from the same night and same incident that brought her allegations against him.  Yet his claim against her was dismissed, while her claim against him remains.  It does not bear repeating that the manner of that dismissal leaves plenty of room for skepticism as to whether plaintiff and Roe were treated the same.[8]  Thus plaintiff has also proven the first element of that claim.

Because Doe has proven a likelihood of success on the merits of both his claims against RPI,[9]  the Court turns to the irreparable harm inquiry.

### B.   Likelihood of Irreparable Harm.

A plaintiff seeking to demonstrate irreparable harm must demonstrate "an injury that is neither remote nor speculative, but actual and imminent."  *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989).  As is implied by "irreparable," money damages must be incapable of fully rectifying the injury.  *Id.*  And of course, the irreparable harm must be preventable by the injunction.  *See Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (charging district courts with considering whether plaintiff will suffer by losing preliminary injunction but prevailing on merits).  Finally, irreparable harm must be "likely" to occur if the injunction is denied.  *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990).

---

[8] Given the conflicting narratives at play, the inevitable implication of denying plaintiff's complaint against Roe is that her complaint against him is merited.  Defendant's decision to dismiss Roe's complaint before plaintiff's final hearing was especially problematic because plaintiff's complaint against Roe cannot now be revived no matter what new evidentiary wrinkles that hearing might produce to undermine her credibility or bolster his own.  Thus, to avoid the appearance of prejudging in favor of Roe, the better procedure would have been to make a final decision for both complaints at the same time and after a hearing giving both of the accused an opportunity to challenge the evidence against them.

[9] Of course, because plaintiff has proven a likelihood of success on the merits, there is no need to resort to the substantial questions on the merits inquiry and its corresponding increase in the requirements for the other prongs of the preliminary injunction standard.  *Chobani*, 157 F. Supp. 3d at 199.

Doe argues that should the Court not enjoin RPI from proceeding under its 2018 policy, he would face the imminent and irreparable harm of participating in a disciplinary hearing that places his academic and professional future in jeopardy without confidence that he will not be subjected to discrimination on the basis of sex at that hearing.  Defendant counters that this proposed injury is neither imminent nor irreparable.

RPI is wrong on both counts.  But first things first.  Defendant's position is that because Doe does not yet know the outcome of the hearing, the potential injury he complains of is purely speculative.  However, the harm plaintiff risks by allowing defendant to use the 2018 policy is that in the absence of the important due process protections afforded by the new Title IX rules and the 2020 policy, plaintiff will be going into a hearing at which there is substantial evidence that the factfinder is biased against him based on his sex and will thus lean toward finding guilt based on his sex alone.  It is the fear of gambling his future on a rigged game that plaintiff asks to be freed from, not the fear of losing the game itself.

Conversely, if the Court enjoins RPI from conducting the hearing, Doe's fear would be allayed because he would not face that hearing until after the final determination on the merits of his case.  Accordingly, plaintiff faces an imminent and definite harm that is directly tied to—and preventable by—a preliminary injunction.

RPI's argument that Doe's harm is not irreparable because he requests damages in his complaint is similarly unavailing.  A harm is not irreparable only where damages are unavailable; a harm is irreparable because damages cannot adequately capture the value of the thing the plaintiff has lost.  *See Eli Lilly & Co. v. Am. Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed. Cir. 1996) (noting that plaintiff had failed to demonstrate irreparable harm because "under the specific circumstances of th[e] case" money damages "would be an adequate remedy" where calculating lost profits would allow for accurate determination of damages).

Calculating the exact monetary value of plaintiff's right to be secure in his belief that his future will be decided fairly is a task far beyond this Court's capabilities, and thus plaintiff's argued imminent harm is also irreparable.

### C.     Balance of Hardships.

As such, the Court now turns to the balance of the hardships.  Doe argues that the equities favor him because delaying RPI from conducting a single disciplinary hearing is a small ask to ensure that it is not discriminating against him.  Moreover, he points out that defendant has already put the 2020 policy in place and there is little hardship to eventually resolving Roe's complaint against him through that mechanism.

RPI's counterargument is the following:

> To allow an individual *found to have violated* the Student Sexual Misconduct Policy to circumvent any and all university[-]based ramifications and sanctions . . . would be an injustice and provide carte blanche for engaging in rape, sexual misconduct and sexual harassment without any possibility of university[-]based sanction.

Dkt. 10, p. 15 (emphasis added).

It is troubling enough that defendant frames protections for one individual's due process rights, whether that individual be male or female, as inciting campus sexual assault on a mass scale.  But far worse is that by its own litigation position defendant seems already to be considering plaintiff to be guilty of violating the policy without giving him any opportunity to challenge its evidence.  Needless to say, defendant's arguments on this point are ill-advised, and do little to demonstrate that the equities do not favor granting plaintiff's requested injunction.

Ultimately, Doe has shown that the balance of the hardships tips decidedly in his favor. After all, RPI's interest in punishing those it finds in violation of its sexual misconduct policy should be no greater than its interest in ensuring that its accused students are not unjustly

punished to their lifelong detriment.  Besides, it is tragically all too likely that more sexual

assault complaints will follow this one.  Delaying one hearing in light of some sobering

evidence of discrimination against a male is an insubstantial loss for defendant, and certainly

not an all-consuming one.  But plaintiff only has one reputation, one career, and one life.

    **D.**    **Public Interest.**

"In exercising their sound discretion, courts of equity should pay particular regard [to]

the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555

U.S. at 24.  Nevertheless, the parties both neglected to address this element.  The Court will

nevertheless assess the evidence on its own and determine whether granting Doe's

injunction would align with the public interest.

It is with no great difficulty that the Court resolves that issue in Doe's favor.  Although

RPI correctly noted at oral argument that Roe's rights need to be protected in this case as

well, that protection cannot come at the expense of Doe's in the absence of a fair

determination of his culpability.  Moreover, that the new Title IX rules exist at all is evidence

that national policymakers have determined that protecting the due process rights of those

accused of sexual assault on college campuses is a matter of grave national import.  There is

no cause to actively impede those efforts by allowing a disciplinary hearing to move forward

despite credible evidence of sex discrimination.

Of course, the most critical issue at stake in the change from the old Title IX rules to

the new is that respondents accused of sexual assault have a right to cross-examine their

accuser at a live hearing.  The Court does not lightly disregard the potential that this change

could discourage accusers from coming forward.  But that policy determination has already

been made by those charged to make those decisions, and second-guessing that choice is

well beyond the scope of this litigation.  Accordingly, the public interest would not be

disserved by granting Doe's requested injunction.  Quite the contrary.  Thus, plaintiff has adequately demonstrated every requisite element of a preliminary injunction, and that injunction must follow.

## V.    CONCLUSION

The Court understands many of the impulses that may cause a school to favor women over men in the context this case presents.  After all, claims of sexual assault like Roe's—and Doe's—are often difficult to prove.  By their very nature, these claims typically involve a level of privacy that undercuts the availability of witnesses, to make no mention of the stigma that attaches so easily to sexual assault victims, the profound psychological trauma that inevitably follows sexual assault, or the age-old stereotypes that call listeners to disbelieve complainants—especially, historically speaking, women.  Much work must be done to ensure that sexual predators are called to justice, and the Court does not shrink from that truth.

Instead, it is to this Court's grudging relief that its task is not to resolve the nettlesome question of how to properly create an environment such that women, who for far too long have been victimized by those stigmas and stereotypes, can feel secure enough to seek justice without allowing an accusation against a man to carry the day on its own.  Rather, it is enough to say this:  whatever answer may come to the question of how to secure the rights of an accusing woman and an accused man, that answer cannot be that all men are guilty. Neither can it be that all women are victims.

As the facts now stand, Doe has made a showing sufficient to establish a reasonable likelihood that RPI has come down on the opposite side of that truth, no matter how dysphonic their chosen path may be when this Court attempts to harmonize it with plaintiff's rights under Title IX.  As a result, plaintiff has also made a sufficient showing that defendant

has threatened his academic future in violation of his rights to equal treatment regardless of his sex, a harm that damages cannot make whole.

Against Doe's protected rights, RPI's showing of the equities amounts to hollow portents of rampant sexual assault and the impermissible assumption that plaintiff is already guilty despite not having so much as a hearing on a matter of grave import to his future. Plaintiff has thus proven each a likelihood of success on the merits, irreparable harm should a preliminary injunction not be granted, that the balance of the equities favors granting the injunction, and that the public interest would not be disserved by enjoining defendant from conducting its hearing against him.  Accordingly, plaintiff's motion for a preliminary injunction must be granted.  Defendant will be enjoined from proceeding in its hearing against plaintiff until its treatment of plaintiff has been tested and this case has run its course.

However, should both parties stipulate in writing to moving forward with the hearing under the 2020 policy, the Court would reconsider the ongoing necessity of this injunction. This allowance is not made because of any position concerning the retroactivity of the new Title IX rules.  Instead, it is a recognition that Doe has made a showing that RPI's current regime may be discriminating against him on the basis of his sex, and if he is satisfied that the 2020 policy's additional protections would adequately shield him—which he has indicated that he believes they would—the Court would be willing to entertain allowing RPI to proceed. Barring that, this Court must be satisfied that defendant adequately protects  male students like Doe before he can be threatened with discipline in this matter.

Therefore, it is

ORDERED THAT

1.  Plaintiff John Doe's motion for a preliminary injunction is GRANTED;

2.  Defendant Rensselaer Polytechnic Institute is enjoined from conducting a disciplinary hearing or otherwise imposing discipline or sanctions against plaintiff John Doe for Jane Roe's complaint of sexual assault until after the resolution of this case; and

3.  Defendant Rensselaer Polytechnic Institute is directed to respond to plaintiff John Doe's complaint no later than Friday, October 30, 2020.

IT IS SO ORDERED.

Dated:  October 16, 2020
          Utica, New York.

David N. Hurd
U.S. District Judge